UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

MYRA S. JOHNSON,          )
     Plaintiff,         )
                   )    Civil Action No. 3:14-cv-00046
v.                  )
                   )    **MEMORANDUM OPINION**
CAROLYN W. COLVIN,       )
Commissioner of Social Security,    )    By:   Joel C. Hoppe
     Defendant.         )    United States Magistrate Judge

      Plaintiff Myra S. Johnson asks this Court to review the Commissioner of Social

Security's ("Commissioner") final decision denying her application for disability insurance

benefits ("DIB") and disabled widow's benefits ("DWB") under Title II of the Social Security

Act, 42 U.S.C. §§ 401–34. The case is before me by the parties' consent under 28 U.S.C.

§ 636(c)(1). ECF No. 14. Having considered the administrative record, the parties' briefs, and

the applicable law, I find that substantial evidence supports the Commissioner's decision that

Johnson is not disabled.

## I. Standard of Review

      The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v.

Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court

asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700,

704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work *See* 20 C.F.R. § 404.1520(a)(4); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four.

*Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled.[1] *See id.*

## II. Procedural History

Johnson protectively filed an application for DIB on July 27, 2011, Administrative Record ("R.") 222–23, and protectively filed an application for DWB on August 8, 2011, R. 224–27. She was 51 years old at the time. R. 222. Johnson alleged a period of disability beginning on November 11, 2009—the day after an ALJ rejected her previous application for benefits. R. 243–44. She claimed her disability was caused by fibromyalgia, depression, anxiety, high blood pressure, degenerative joint disease, osteoarthritis, and anti-nuclear antibodies. R. 248. Disability Determination Services ("DDS"), the state agency, denied her claim at the initial and reconsideration stages. R. 104–31, 134–63.

On July 15, 2013, Johnson appeared with counsel at an administrative hearing before ALJ Mark O'Hara. R. 35–77. ALJ O'Hara denied her claim in a written decision issued on October 8, 2013. R. 14–34. He identified Johnson's date last insured as March 31, 2012,[2] and found that Johnson met the non-disability requirements for DWB through that date. R. 16–17. He then observed that since her alleged onset date, Johnson had worked part-time as a housekeeper and as a nanny, but found that these did not amount to substantial gainful activity. R. 17. He determined that Johnson had severe impairments of obesity, lumbosacral spine spondylosis, and

---

[1] "For [DWB], in addition to showing disability, a claimant must show that she is a widow who has attained the age of fifty and is unmarried (unless one of the exceptions in 20 C.F.R. § 404.335(e) apply) and that her disability began before the end of the prescribed period." *Fraley v. Astrue*, No. 2:10cv762, 2011 WL 2681647, at *2 (S.D.W. Va. July 11, 2011) (citing 42 U.S.C. § 402(e); 20 C.F.R. § 404.335). Disability for DWB claims is evaluated under the standard five-step sequential evaluation process. *Lavender v. Colvin*, No. 1:10cv903, 2014 WL 237980, at *2 n.4 (M.D.N.C. Jan. 22, 2014) (citations omitted).

[2] The ALJ also identified July 31, 2012, as Johnson's date last insured. R. 17.

fibromyalgia syndrome, R. 17–19, but that these impairments, alone and in combination, did not meet or medically equal the severity of a listed impairment, R. 19–20.

The ALJ next found that Johnson had the residual functional capacity ("RFC")[3] to perform light work[4] with some postural limitations. R. 20–32. Based on this RFC finding and the testimony of a vocational expert ("VE"), the ALJ determined that Johnson could perform her past relevant work as a nanny and a teacher's aide, or, alternatively, could perform other work existing in the national economy, including non-USPS mail clerk, counter rental clerk, and parking lot attendant. R. 32–34. Therefore, the ALJ concluded that Johnson was not disabled. R. 34. The Appeals Council received additional evidence into the record, R. 5, but ultimately declined Johnson's request for review, R. 2–4. This appeal followed.

## III. Facts

### A.    Relevant Medical Records

The administrative record contains medical records spanning the period from October 2006, R. 356–63, through May 2013, R. 996. The record prior to the alleged onset date of November 11, 2009, indicates that Johnson suffered from periodic, generalized aching and pain associated with her fibromyalgia. Johnson complained of pain in her neck, shoulders, arms, hips, thighs, knees, and shins. R. 335, 338, 372, 374, 382, 463–64, 466, 472–75, 478, 494, 527, 536, 539, 544. Johnson also reported fatigue caused by her fibromyalgia, R. 476, though the record

---

[3] A claimant's RFC is the most he or she can do on a regular and continuing basis despite his or her impairments. 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

[4] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. § 404.1567(b). A person who can meet these lifting requirements can perform light work only if he or she also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

suggests the fatigue may have been caused by medication she took for hypertension, *see* R. 494–96, 542, 544.

Johnson's subjective descriptions of her fibromyalgia symptoms varied. She told Michael Harper, M.D., of the University of Virginia Health System's ("UVAHS") Family Medicine Clinic, that her fibromyalgia was day to day, with some aching on most days, but fewer symptoms on others. R. 474, 478. On occasion, Johnson complained of intense pain that prevented her from functioning. R. 335, 374, 463, 474. Physical examination findings during some of those visits and others, however, documented that her fibromyalgia caused generally mild to moderate signs, or was otherwise under control and clinically stable. R. 374, 382, 411, 527, 542, 544. She typically had full range of motion in her neck and both upper and lower extremities. R. 372, 411, 464, 466, 530–31, 544. She did on occasion experience pain upon range of motion in her hips and neck, R. 372, and upon range of motion and adduction above 90 degrees in her shoulders, R. 374, 466, 474. She sometimes exhibited tenderness to palpation at multiple points, including in her left upper extremity, around her chest, and along her back. R. 374, 464, 466, 543.

In August 2008, Johnson was diagnosed with plantar fasciitis in both feet (though more severe in her right foot) after reporting pain that rendered her nearly unable to walk. Dr. Harper recommended exercise and provided her with written material regarding her condition. R. 476. She later reported feeling better after undergoing physical therapy. R. 533. In August 2009, Johnson reported pain in her left foot and ankle resulting from a fall. She could bear weight and ambulate on the affected foot, but complained that this aggravated her pain. Her foot and ankle were tender to palpation but had full range of motion. She was diagnosed with arthritis of the left ankle joint. R. 529–32.

The first medical record following Johnson's alleged onset date is from a November 13, 2009, visit with Donald L. Kimpel, M.D., at the UVAHS Rheumatology Clinic.[5] In addition to generalized aching from her fibromyalgia, Johnson complained of pain in her lower back and over her left hip. She stated that she walked twice per week and attended physical therapy. Dr. Kimpel offered an injection, which Johnson declined, for left hip pain. R. 738–39.

On November 30, 2009, Johnson reported to Dr. Harper with complaints of worsening pain in her shoulders, neck muscles, hips, and upper thighs. She also indicated some generalized weakness. Physical examination revealed tenderness on paracervical and levator scapulae, rhomboid muscle area, trapezius muscle superior portion, and anterior and lateral thighs bilaterally. Johnson had full range of motion in her neck and shoulders, but had pain on shoulder adduction from 60–90 degrees all the way over her head. Examination of her hips revealed pain on all versions, with some limitation of internal and external rotation. Examination of her knees was within normal limits. Dr. Harper observed that Johnson was teary as she discussed her symptoms. He noted that she was taking Paxil only on an intermittent basis, with no explanation as to why she was not taking it regularly. Dr. Harper expressed concern about the possibility of polymyalgia rheumatica. He increased Johnson's dosage of Paxil with instructions to take it daily, and he also prescribed a daily dosage of prednisone for her pain. R. 560–61.

Johnson reported back to Dr. Harper on December 28, 2009. She told him that she was taking Paxil regularly and that she had noticed a dramatic improvement in her pain after starting prednisone. Examination revealed only some musculoskeletal discomfort consistent with Johnson's fibromyalgia. Her gait and cerebellar functions were normal, with no muscle

---

[5] A significant portion of Dr. Kimpel's handwritten treatment notes is illegible.

tenderness noted. Dr. Harper concluded that Johnson's fibromyalgia was clinically stable. R. 604–05.

On February 8, 2010, Johnson reported to Eric Carson, M.D., at the University of Virginia's McCue Center Clinic. Johnson complained of mild discomfort and pain related to her plantar fasciitis. Examination revealed tenderness over the plantar aspect of her foot and full range of motion. R. 705–06. X-rays of her left hip taken that same day revealed no acute fracture or dislocation, and no significant hip joint space narrowing or osteophyte formation. R. 636. Johnson underwent a hip injection on February 12. R. 633–35. When she reported back to Dr. Carson on March 16, he observed that she had responded extremely well to this procedure. She also told Dr. Carson that she was doing reasonably well and continued to work on light duty restrictions. R. 600. Johnson visited Dr. Carson again on June 15, 2010. She stated that her foot felt reasonably well, but she also complained of localized discomfort over her IT band. Dr. Carson found X-rays of her hip to be unremarkable. He ordered another injection of Johnson's hip and did not recommend therapy, but noted that therapy would be the next step if the injection did not improve Johnson's pain. R. 676–77.

On July 19, 2010, Johnson went back to Dr. Harper for a follow-up visit. She had little to report other than her left hip pain, which had been diagnosed as a proximal iliotibial band syndrome. The injection she received had provided some relief, but did not totally alleviate her discomfort. She also complained of generalized myalgias, and Dr. Harper found her blood pressure to be at the upper limits of normal. Johnson stated that she was not taking Naprosyn because she did not believe that it helped much, but instead wanted to try a new anti-inflammatory. She told Dr. Harper that she continued to do some housekeeping work with her housecleaning business, but did not do very much at the time. She also claimed that she feels

worse for several days if she "overdoes it." Dr. Harper noted that Johnson's pain was located in her neck, shoulders, and left hip extending down the lateral side of her thigh. Johnson was able to walk and function, and her activities of daily living were without restriction. Physical exam revealed full range of motion in her neck, upper extremities, and knees. Johnson also had full range of motion of both hips, but with some limitation of external rotation. She had a negative straight leg raise test and tenderness to the trapezius, levator scapulae, paracervical muscles, and superior portion of the left IT band. Dr. Harper prescribed Voltaren and also recommended glucosamine because medical personnel from orthopedics thought she had a degenerative joint disease component to her discomfort. R. 555–56.

Johnson had another visit with Dr. Carson on August 23, 2010. She stated that a hip injection she received helped her significantly, but she still had some soreness in that region. Upon examination, she had a positive Ober test and point tenderness. Dr. Carson prescribed physical therapy and stretching exercises for her hip. R. 593–94. Johnson followed up with Dr. Carson on October 7, 2010. She stated that her ankle felt well, but that her hip pain was worsening. She described the pain as radiating into the leg and thigh, and she complained of weakness, but no numbness or tingling. Johnson had full range of motion in her hip and tenderness over the greater trochanter, with slight pain upon flexion and extension of the hip and lower back. Dr. Carson found Johnson's pain to be consistent with hip osteoarthritis and trochanteric bursitis. R. 592.

On November 4, 2010, Johnson presented to the UVAHS Emergency Department with an acute headache and associated dizziness, blurred vision, and lightheadedness. Johnson's blood pressure was also higher than normal. Physical examination was negative for leg pain above baseline. Johnson's strength was 5/5 in all extremities, and her gait was steady and at a normal

pace. She was discharged in stable condition after her symptoms resolved. R. 586–90. Johnson followed up on November 10 with Catherine Casey, M.D., at UVAHS. Johnson explained that she had discontinued some of her blood pressure medications because of adverse side effects. Review of symptoms was positive for anxiety and left hip pain. R. 591.

Johnson visited Dr. Carson again on November 18 to follow up regarding her left hip IT band syndrome and osteoarthritis. Johnson stated that a hip injection had helped her significantly, but some soreness remained. She also complained of pain originating in her lower back and radiating to the left leg. She had a positive Ober test and point tenderness. She was tender in the greater trochanteric region and had pain with flexion of her spine. Dr. Carson provided her with a physical therapy home exercise program and stretching exercises. R. 585–86. At a follow-up visit on January 6, 2011, Johnson told Dr. Carson that her pain had slightly improved since her last visit, with worse pain in her groin than in her back, buttock, and lateral thigh. Upon examination, Johnson had negative Ober and FABER tests, but a positive straight leg raise test and increased pain with hip external and internal rotation. Dr. Carson scheduled Johnson for a fluoro-guided corticosteroid injection of the left hip to delineate whether her hip or her back was the primary source of her pain. He also recommended that Johnson continue with low-impact aerobic exercise. R. 584–85.

Johnson received the injection on January 20, R. 626–30, and followed up with Dr. Carson on March 3. Dr. Carson noted that a radiograph showed moderate bilateral hip osteoarthritis. Otherwise, his report was essentially identical to that of Johnson's previous visit. R. 583–84. On March 10, 2011, Johnson reported to Dr. Casey with complaints of congestion and a headache. Review of symptoms revealed joint pain. R. 582–83. Johnson returned to Dr. Carson on April 14, 2011. She reported that her ankle was doing well, but stated that she had

worsening pain in her hip that radiated into her leg and thigh. She complained of weakness, but not of numbness or tingling. Johnson had full range of motion in her left hip, with tenderness over the greater trochanter and slight pain on flexion and extension of the hip and lower back. Dr. Carson's record of this visit also indicates that Johnson was to return to light duty work in mid-May. R. 581–82.

On May 27, 2011, Johnson visited James Browne, M.D., at UVAHS. Johnson told Dr. Browne that her symptoms had improved significantly after receiving an intraarticular injection in her hip and that her pain had improved overall since it began the previous year. She stated that she was very active and walked five miles per day. She still had pain located in her groin and the lateral aspect of her hip that radiated down her leg. Physical exam revealed no swelling, redness, or inflammation in the area of her left hip. She had full range of motion with painful internal rotation, painless knee motion, and negative straight leg raise test. Johnson was nontender over the sacroiliac joint, lumbar spine, and greater trochanter. X-rays revealed coxa profunda with good joint preservation and very minimal arthritis. Dr. Browne concluded that Johnson's symptoms were well controlled with conservative management, but left open the possibility of surgery if conservative treatment failed. R. 580–81.

Johnson returned to Dr. Browne on July 18, 2011, complaining of new pain that radiated down her leg into her foot and of discomfort in her lower back. Dr. Browne opined that the groin pain Johnson had been experiencing was secondary to this radiating leg pain. Upon physical examination, she was tender to palpation at her lower back and mildly to moderately tender over the greater trochanter. Johnson had mild groin pain with internal rotation and flexion of her left hip. Left straight leg raise was positive. Radiographs suggested pincer femoro-acetabular impingement ("FAI") with a center-edge angle of 50 degrees. R. 652–53.

On July 26, Johnson visited Adam Shimer, M.D., at the UVA Spine Center, on referral from Dr. Browne for evaluation of lower extremity pain. Johnson informed Dr. Shimer that her pain began a year ago when she fell running from a dog. She reported that injections to her hip, including greater trochanteric and intrathecal injections, offered her no relief. She denied intrinsic back pain, but described left lateral leg pain, which she rated 8/10, intermittently aggravated mostly by prolonged standing or ambulation. Dr. Shimer also noted that Johnson had back pain that was aggravated by prolonged sitting. Johnson's pain was limited to her left lower extremity, with no pain on her right side. She described weakness secondary to pain, but denied numbness or tingling. She managed her pain with physical therapy and non-steroidal anti-inflammatory drugs ("NSAIDs"), such as Aleve. Physical examination showed that Johnson could ambulate without aids, and she could toe walk, heel walk, and ambulate with a tandem gait without difficulty. She was tender to palpation on the left paraspinal musculature, but had no tenderness in the midline of her lumbar back. She was also significantly tender to palpation in the area of the greater trochanter of her left lower extremity. Motor strength was 5/5 in all extremities. Interpreting lateral and AP views of Johnson's lumbar spine, Dr. Shimer noted some degenerative changes of the L5-S1 and grade 1 anterolisthesis at L4 over S5. Dr. Shimer suggested that Johnson undergo an MRI, which she was reluctant to do at that time because of her claustrophobia. Instead, Johnson and Dr. Shimer agreed that she could continue with conservative management, which Johnson said improved her symptoms, and that she could return at another time for an MRI and possibly other interventions, including epidural steroid injection. R. 641–43.

Johnson returned to Dr. Casey on August 4, 2011. She reported that she was taking Aleve, but still suffered from leg pain and that her chronic pain was making her depressed. Dr.

Casey observed that Johnson "border[ed] on tearful" and was overwhelmed during the visit. She prescribed tramadol for Johnson's leg pain and noted that Johnson did not do well on Cymbalta and that she might try Lyrica to treat fibromylagia. R. 759–61. On August 8, Johnson had another visit with Dr. Browne, who noted that her pain had improved since her last visit with him. The nature of Johnson's pain had remained unchanged—appearing to stem from lower back pain and sciatica, and accompanied by groin and lateral hip pain. Johnson had a normal gait and a negative straight leg raise test. There was tenderness around her left hip, but no swelling, redness, or inflammation. Johnson had full range of motion in her hip, with painful internal rotation, but good strength and range of motion with flexion and extension. Her knee motion was painless. X-rays revealed coxa profunda and FAI with good joint preservation and very minimal arthritis. R. 646–47.

On August 17, Johnson met with Quanjun Cui, M.D., to discuss non-operative options for managing her hip pain. She rated her pain level at 6/10 and told Dr. Cui that home exercise, physical therapy, and injections had been somewhat effective. Johnson's gait was antalgic and she was tender over her greater trochanter. Her strength and range of motion were normal. A straight leg raise test was negative, and imaging revealed no arthritic change. As a first-line treatment, Dr. Cui recommended use of over-the-counter NSAIDs. He also recommended low impact exercise, including hydrotherapy and water aerobics; lifestyle changes, such as diet and exercise, to help manage her weight; and use of a cane or walker for ambulation. Dr. Cui also suggested intra-articular injection with cortisone, which was administered that day. R. 751–55.

On September 7, 2011, Johnson reported to Dr. Casey that her back pain had become worse and that she hurt "all over." She stated that both legs hurt frequently and felt weak. On examination, Dr. Casey observed that "[e]ven small movements seem to take a lot of effort,"

although she also noted that Johnson exhibited "[d]ramatic affect out of proportion to exam." A straight leg raise test was negative, but light palpation of the lumbar spine caused extreme pain. Dr. Casey prescribed tramadol, which Johnson told her had previously helped with her pain. R. 749–51. On September 14, 2011, Johnson underwent an MRI of her lumbar spine. Imaging revealed lower lumbar spondylosis, most pronounced at L4-L5, with mild central canal and lateral recess stenoses and hypertrophy and effusions of the bilateral facet joints. R. 618–21. The same day, Johnson told Michelle Huggins, R.N., at the UVA Imaging Center, that she did not want to do injections at that time. Huggins noted that Johnson was taking her pain pills, but not on a regular basis. R. 748.

On September 22, Johnson met with Lora Baum, Ph.D., for an initial evaluation regarding psychological management of her pain. Johnson told Dr. Baum that she had worked as an in-home nanny between ages 20 and 40 and also had worked for many years as a teacher's aide before she stopped working in 2008 because of her fibromyalgia symptoms. She described two distinct manifestations of pain. The first was lower back pain that radiated into her left leg. Johnson claimed that the onset of this pain was in 2010 and that the severity of her pain ranged from 4–9/10, with her current pain level at 5/10. She described it as throbbing and aching. She claimed it was aggravated by bending and being on her feet for too long and was relieved by lying down, using blankets to create a warm environment, and changing positions. She treated this pain using physical therapy, stretching, and medication. The second type of pain Johnson described was her all-body fibromyalgia pain, which began around 2002. She noted it was particularly bad at her neck and shoulders. The only treatment she claimed to have used for this pain was aqua therapy, which she tried once in 2005 and quit after it made the pain worse. She stated that she lived alone, and she described her typical day as including stretching exercises in

the morning. She explained that she liked to walk, but could not do this as much as she used to. She stated that she visited with elderly friends, occasionally helped to take care of her granddaughter, and regularly attended church. R. 766–70.

Johnson returned to Dr. Browne on October 17. She denied having groin pain, but continued to have pain near her lower back that radiated into her leg. Her previous injection provided little relief. Johnson's gait was antalgic and a straight leg raise test was negative. She had diffuse tenderness to palpation over her thigh and lower back. Johnson's strength and range of motion were good, and she had pain-free internal and external rotation. Dr. Browne opined that the source of Johnson's pain was in her lumbar spine rather than her hip. R. 832.

On October 24, 2011, Johnson told Dr. Baum that her back and hip pain rated 5/10. R. 831. She returned on November 3 in tears, however, claiming she had been largely unable to walk since her previous appointment. She believed that she "overdid it" when walking up to the top of the Monticello trail and back, which took over 45 minutes, and stated that she could not walk at all the next day and continued to be in pain. She rated her pain during this visit at 9/10 and described it as being located in her back, hip, and all over the rest of her body. Johnson told Dr. Baum that she did not take medications that had helped manage her pain because she did not want to become dependent on them.[6] Dr. Baum observed that Johnson struggled to accept the idea of moderately pacing her activities. R. 826–29.

On November 14, 2011, Johnson met with Robin Hamill-Ruth, M.D., for pain management. She stated that her back and left leg pain had greatly improved in the year since it began, but that it had gotten particularly bad over the previous month. She rated her pain at 5/10 and described it as burning and aching. She described receiving great benefit from prednisone,

---

[6] Dr. Baum subsequently informed Dr. Casey by email that Johnson was not taking her prescribed pain medications. R. 827.

but little from tramadol. She exhibited tenderness, bony tenderness, pain, and spasm in her lumbar back. Dr. Hamill-Ruth noted that Johnson had not tried neuropathic medications or muscle relaxants—although she had previously received a prescription for Flexeril, she never filled it. Dr. Hamill-Ruth prescribed gabapentin, baclofen, and ibuprofen. R. 823–26. Johnson returned on November 28 and described her back and leg pain as rating 6/10. Her musculoskeletal exam was positive for back pain and gait problem. That same day, she received a lumbar epidural steroid injection ("LESI"). R. 817–21. On November 30, Dr. Baum observed that Johnson appeared less depressed and in less pain, although Johnson stated that pain all over her body rated 7/10. R. 815–16. At a December 16 visit with Dr. Casey to address cold symptoms, Johnson stated her back and leg pain were not as bad and that her neck and shoulder pains were likewise improving. R. 814.

On January 1, 2012, Johnson reported to Justin Ford, M.D., that the LESI she previously received caused no change in her leg and back pain, which she rated 9/10. Her musculoskeletal exam was positive for back pain and gait problem. A straight leg raise test was negative, and she had normal strength and sensation to touch. Dr. Ford provided refills for Johnson's ibuprofen and baclofen and advised her to begin home exercise and stretching programs. R. 810–13. She returned to Dr. Casey on January 25 and reported that the LESI had helped some, although not much. She stated that lifting and standing had become difficult and that her leg pain was not getting better. R. 804.

On January 30, she saw Joshua Smith, M.D., and reported that the LESI had diminished the severity of her leg pain and that the pain no longer extended below the knee. She claimed that her pain got worse with standing and sitting and was relieved with resting. She had full range of motion in her lower back. A left straight leg raise test was negative, but her right straight leg

raise test was positive at 45 degrees for contralateral back pain, which resolved with decrease of

5 degrees and returned with dorsiflexion. R. 797–800. On February 13, Johnson met again with

Dr. Baum and rated her pain, which was mostly located in her hip, at 3–5/10. Dr. Baum noted

that Johnson appeared to have a better grasp of the fact that she had a role in managing her own

pain. R. 793–96. Johnson received a second LESI on February 20, 2012, R. 789–92, and on

March 15 told Dr. Casey that this had helped some, although she was still sore when she moved,

R. 993. She also told Dr. Casey that she was doing well and working part-time. *Id.* On March 18,

she reported to the emergency room with chest pain that began while she was walking around at

church. Her musculoskeletal exam revealed full range of motion. She was discharged with

instructions to follow up with her primary care physician about a cardiac stress test.[7] R. 988–91.

She returned to Dr. Casey on March 22 and was prescribed Topamax for lumbar radiculopathy

and myofascial pain. R. 984–86.

The record continues for some time past Johnson's date last insured of March 31, 2012.

She underwent her third LESI on April 3, R. 979–84, and in May underwent a lumbar medial

branch block and denervation, R. 961–66, 974–78. The injections, medial branch block, and

denervation were effective in providing Johnson with some relief from her pain. R. 958–59, 962,

968, 974, 980. In addition to the chronic pain in her lower back, left hip, and left thigh, Johnson

began experiencing isolated pain in both calves. R. 958, 962. In June 2012, Johnson told Dr.

Baum she experienced 5/10 pain located in her shoulders, arms, and legs. R. 956. In August

2012, Johnson sustained a laceration to her left wrist and a bruise of her left hip after a fall. She

also reported pain in her neck, left shoulder, left elbow, and left thigh. She was able to relieve her

---

[7] The stress test ultimately revealed normal findings not likely representing ischemic heart
disease. The doctor who reviewed the test results opined that Johnson's anxiety and fibromyalgia
"seem to play a significant role in her life and may be contributing to her symptoms." R. 973.

pain somewhat by taking Aleve. Range of motion in her left shoulder was limited. R. 940–43. In September 2012, Johnson had improved range of motion in her back and left hip as a result of physical therapy. She reported doing home exercises, walking, cutting back on food, and "[p]ushing through the fibromyalgia." R. 935. She did not like taking medications, but was using Ibuprofen. Her lower back pain had resolved following the medial branch blocks and at the time was limited to areas of trauma as a result of her fall. R. 937. In November 2012, however, Johnson told Dr. Casey that her lower back and thigh pain had returned. R. 1030.

On November 27, 2012, Johnson informed Joseph Gjolaj, M.D., that prior to her fall in August 2012, she had good relief from her symptoms through physical therapy and medication. After her fall, however, her pain grew worse and she was unable to continue her job as a nanny. She described the pain as 7/10 at its worst and 4–5/10 with activity modification or over the counter medicines. She noted that 80% of the pain was in her back and 20% in her anterior thighs. She was tender to palpation in her thoracic and lumbar spine and had diminished range of motion secondary to pain. Dr. Gjolaj found that Johnson's back impairment did not warrant surgery, and he recommended continuing with physical therapy. R. 1028–30. On November 28, she returned to Dr. Casey reporting sharp pain in her neck and left arm that hurt with even minor compression near her shoulder. Dr. Casey noted mild pain on "resisted coke can test" and no pain with internal or external rotation against resistance or with subscapular liftoff. Dr. Casey expressed concern that this could be cervical radiculopathy. R. 1025–28. On December 4, Johnson exhibited lower back pain on range of motion of her knee and received a steroid injection for the knee. R. 1022–25. On December 27, she informed Dr. Casey that her left side still hurt, but that she planned on returning to light duty work. She took baclofen as needed, but

limited use of hydrocodone because she was afraid of becoming addicted. She had not been taking topamax. R. 1016–17.

On January 29, 2013, Johnson reported to the emergency room after a car accident complaining of left shoulder pain. She was tender to palpation, but her range of motion was preserved. She was prescribed flexeril and NSAIDs. R. 1012–15. She later informed Dr. Casey that after the accident, her pain, which she rated 6/10, was located in her head, neck, and shoulder. She used ibuprofen and hydrocodone only sparingly, not every day. R. 1011. She continued to exhibit pain and stiffness in her neck and shoulder. R. 996, 999, 1004. Her range of motion in these areas was normal, however. R. 1002, 1007. She also reported continuing pain in her back and left hip, R. 1002, although she got some relief from a trochanteric bursa shot. R. 996–97. Johnson stated that she took Aleve, used heat, and walked for exercise. R. 999. She also stated, however, that she did not get any help from TENS, mobic, ibuprofen, and baclofen. She stopped taking flexeril and topamax. R. 999. Johnson reported self-managing her fibromyalgia and doing pretty well with it. R. 1003. When she visited Dr. Casey in March, Johnson stated that she had weaned herself off of all pain medicine other than Aleve, had been walking to the mall every other day, and would rather not do physical therapy. R. 997.

B.    *Relevant Opinion Evidence*

1.    *Dr. Casey's Opinion*

The record includes two medical opinions[8] submitted by Dr. Casey. The first, dated May 29, 2013, stated that Johnson had dealt with musculoskeletal problems since 2004. Dr. Casey

---

[8] "Medical opinions are statements from . . . acceptable medical sources that reflect judgments about the nature and severity of [the applicant's] impairment(s)," including: (1) the applicant's symptoms, diagnosis, and prognosis; (2) what the applicant can still do despite his or her impairment(s); and (3) the applicant's physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2).

explained that Johnson had been in several motor vehicle accidents that resulted in injury and reinjury of her left shoulder, arm, hip, and leg. She also noted that Johnson had been diagnosed with fibromyalgia, which resulted in diffuse body pain that flares up every few days or weeks, and which Dr. Casey described as "incapacitating." Dr. Casey stated that Johnson had been compliant with all treatment suggestions and was motivated to improve her functioning through lifestyle modification and regular exercise. In spite of this, Dr. Casey stated that over the past thirteen years doctors had been "unable to stabilize [Johnson's] rheumatologic and orthopedic conditions to the point where she has been able to maintain regular employment secondary to the unpredictable nature of her pain." R. 1038.

Dr. Casey's second opinion is dated February 12, 2014, and was submitted in response to the ALJ's decision to deny benefits to Johnson. Dr. Casey opined that Johnson's fibromyalgia was "most reflective of her pain complaints." She agreed that imaging did not show a clear etiology for Johnson's pain, but noted that fibromyalgia often does not produce remarkable imaging. She stated that fibromyalgia typically is not treated through surgery or use of opioid medication, but instead should be treated using physical therapy, exercise, and muscle relaxants. Dr. Casey again stated that Johnson had been compliant with all of these recommendations. Finally, she noted that Johnson's fibromyalgia would cause her difficulty in maintaining employment because she "can have relatively good days with high functional status, and without warning have bad days where [her] pain precludes [her] from leaving the home." R. 1041.

2.     *DDS & SSA Evaluations*

On October 18, 2011, William Amos, M.D., reviewed Johnson's medical record as part of DDS's initial disability determination. He noted that the evidence indicated that Johnson experiences pain from osteoarthritis, degenerative disc disease, and fibromyalgia, but that recent

physical examinations demonstrated normal strength, range of motion, and gait. He found that Johnson had the RFC to occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand and/or walk for 6 hours out of an 8-hour day; sit for 6 hours out of an 8-hour day; occasionally climb ramps or stairs; occasionally climb ladders, ropes, or scaffolds; and frequently balance, stoop, kneel, crouch, and crawl. On reconsideration, Leslie Ellwood, M.D., affirmed Dr. Amos's RFC determination. R. 104–48.

On June 25, 2012, Social Security Administration ("SSA") consulting physician Barbara Cochran, M.D., submitted an opinion and RFC determination based on a review of the medical record. With regard to Johnson's hip pain, Dr. Cochran noted that x-rays showed mild to moderate osteoarthritis, but also noted that Johnson and her physicians agreed that her hip pain was secondary to her LSS spondylosis. She observed that Johnson had received LESI treatment, remained neurologically intact, had normal muscle tone and strength, and had no gait abnormalities. She opined that Johnson's fibromyalgia diagnosis was suspect, given the lack of ongoing or longitudinal treatment for that disorder and the diagnosis of LSS spondylosis. She noted that Johnson stated that she "sits all day talking to friends, is independent for [activities of daily living] but has pain, drives, shops, multiple postural limitations, squatting causes knee pain, uses a cane." She stated that the medical record did not indicate any issue with Johnson's knees or show that a cane was needed or prescribed. She therefore found Johnson's statements to be partially credible. R. 913.

C.     *Johnson's Submissions and Testimony*

Johnson completed and submitted a pain questionnaire to DDS on August 30, 2011. She stated that her pain was located in her arms, legs, fingers, hip, and back. She described the pain as aching and throbbing and claimed that her pain lasted all day, every day. She alleged that the

pain caused her to "shut down" and that she treated it with medication, injections, and by lying down. R. 267–68. On September 6, 2011, Johnson submitted a function report in which she described her activities of daily living. She lived alone, did not own any pets, and did not help care for other people. On an average day and depending on how she feels, she may do light cleaning and start a task such as laundry before returning to it on a later date. Because of lack of energy, she took a long time with dressing, bathing, caring for her hair, and using the toilet, although she did not state that she was precluded from doing any of these activities. She stated that she cooked her own meals, went outside every day, traveled by car or by walking, and shopped for groceries. She alleged that her pain caused her to have difficulty sleeping and walking, and it limited her to lifting less than ten pounds. Johnson stated that she socialized with friends by phone, went to physical therapy, and occasionally attended church. She also reported using a cane for walking. R. 292–99.

In addition, Johnson's sister, Tonya Williams, submitted a third-party function report. Williams claimed that Johnson's pain caused her to take a long time to get out of bed and that Johnson stayed at home more often and went to bed early. Williams also explained that Johnson used to walk long distances, socialize with friends and family, and travel, but could not do these activities any more because of her disability. Similar to Johnson's own statements, Williams claimed that Johnson's pain caused difficulty sleeping and that she took a long time with dressing, bathing, caring for her hair, and using the toilet. She explained that Johnson could do some light cleaning, but needed help from others for heavier work. Williams noted that Johnson could drive, but when she was in pain would either stay home or get a ride from someone else. She claimed that Johnson's pain often hindered her from taking part in social events, but that she still went to scheduled therapy and medical appointments as often as needed. Williams also

stated that Johnson walked using a cane that had been prescribed by a doctor in August 2011. R. 270–80.

At the administrative hearing, Johnson testified that on an average day, she spent half the day or more resting in bed. R. 44, 46. She explained that she could motivate herself to do a task such as cooking breakfast or starting the laundry, but felt like she needed to rest shortly afterward. R. 44–45. Johnson stated that because of the weakness in her legs, she needed help from her son to move a vacuum upstairs for cleaning. R. 49. She claimed that sitting made her uncomfortable and that after a period of time sitting she needed to either stand up and move around or lie down. R. 46. She also claimed that standing for more than ten or fifteen minutes caused discomfort. R. 48.

Johnson stated that she had difficulty sleeping and that she struggled with becoming overly emotional because of her pain and that this made it difficult for her to leave the house. R. 47, 51–52. She claimed that she left the house only about once per week. R. 53. She described the pain from her fibromyalgia as "excruciating," explaining that it originally manifested in her shoulders and her hip before moving down to her back and her legs. R. 49–50. She explained that she got relief from her fibromyalgia pain only by lying down and that her back pain had been temporarily relieved by medial branch block and denervation procedures before it eventually returned. R. 50–51.

Johnson told the ALJ that she weighed 189 pounds. When he asked if this was her normal weight, she explained that her normal weight was actually about 160 pounds, but that the last time she weighed this much was when she was in her thirties. R. 54–55. She told the ALJ that she went to the store around twice per week and went to church two or three times per month. R. 55. When asked about her last job, Johnson stated that she had not worked since her nannying

job ended four or five years earlier. R. 56–58. She also acknowledged that she had worked

fifteen to twenty hours per week helping elderly people as recently as 2007. R. 58–59. Johnson

told the ALJ that she attended physical therapy twice per week, exercised and stretched at home,

and walked twenty to thirty minutes with a local group about once per week. R. 61–62. She also

stated, however, that she had not walked any significant amount in about a year. R. 63. She

claimed that she ushered at church about once per month at services that lasted approximately

two hours, and she also stated that she occasionally babysat for her grandchild. R. 64–65.

## IV. Discussion

Johnson alleges that the ALJ's determination that she was not disabled during the period

at issue is not supported by substantial evidence.[9] Pl. Br. 9–12, ECF No. 13. Specifically,

Johnson claims that the ALJ erred in weighing her credibility and in weighing the medical

opinion evidence.

*A.     Credibility*

*1.      The ALJ's Determination*

---

[9] Johnson also aruges that the ALJ applied the wrong standard in analyzing her fibromyalgia. Pl. Br. 7–9. In particular, she focuses on a footnote, appended to the ALJ's discussion of whether Johnson met or equaled a listed impairment, citing a portion of *The Merck Manual, 17th Edition*, that describes treatment methods for fibromyalgia. *See* R. 20 n.3. Johnson argues that this information is out of date and does not comport with Social Security Ruling ("SSR") 12-2p, 2012 WL 3104869 (July 25, 2012), which sets the standard for evaluating fibromyalgia in disability claims. Pl. Br. 7–9. To the extent she claims that the footnote itself is reversible error, she has failed to explain how it has prejudiced her or influenced the ALJ's decision. The ALJ did not find that Johnson's fibromyalgia was not a medically determinable impairment; on the contrary, he found that it was a severe impairment. R. 17. Moreover, Johnson does not challenge the ALJ's finding that her fibromyalgia did not meet a listed impairment. To the extent Johnson simply argues that this footnote illustrates the ALJ's overall misunderstanding of fibromyalgia and its symptoms, this argument must be rejected. The ALJ did not rely on or discuss the cited passage from *The Merck Manual* in any other part of his analysis. The ALJ's analysis shows that he adhered to the five-step sequential process and did not misapply the law.

In making his RFC finding, ALJ O'Hara determined that Johnson was not credible as to the severity of her limitations. He first opined that Johnson's treatment record did not indicate that her symptoms were severe. He observed that the imaging and testing evidence in the record did not provide objective support for an impairment that could reasonably produce symptoms of the intensity Johnson described. He noted that instead of using strong pain medications, Johnson used muscle relaxers and NSAIDs, which were effective in providing relief. The ALJ found that Johnson's physical examinations did not reveal ongoing psychological signs, significant neurological deficits, or decreased strength or range of motion that would be expected with severe limitations. He observed that Johnson's treatment was routine, with no recommendations for surgery or ongoing treatment by an orthopedic, neurology, or rheumatology specialist, and that she was in reasonably good health. R. 30.

In addition, the ALJ found that Johnson's history of disability applications was relevant to her credibility. He noted that this was her fourth application for benefits since 1987, and therefore found it to be "clear then that [Johnson's] principal motivation for the past at least 7½ years has been to pursue a disability, which has completely colored what she says and does." *Id.* He also found that Johnson's actions were inconsistent with her statements. The ALJ noted that although she claimed that she was disabled and unable to work since November 11, 2009, and testified that she had stopped working as a nanny in 2006 or 2007, the record showed that she actually did not stop working as a nanny until her fall in August 2012 and that she planned to return to light duty work in December 2012. *Id.* (citing R. 1017, 1029).

The ALJ further found Johnson's statement that her "normal" weight was 160 pounds undermined her credibility because the medical evidence shows that she weighed around 200 pounds throughout her alleged disability period. R. 30–31. The ALJ also found that Johnson's

earlier statements regarding her daily activites—that she spent most of the day in bed and could not sit for more than fifteen minutes—contradicted her later statements that she attended physical therapy twice per week, did home exercises, walked with a group, worked as an usher at church, and occasionally babysat for her grandchild. R. 31.

   2.   *Analysis*

   The regulations set out a two-step process for evaluating a claimant's allegation that she is disabled by symptoms, such as pain, caused by a medically determinable impairment. *Fisher v. Barnhart,* 181 F. App'x 359, 363 (4th Cir. 2006) (citing 20 C.F.R. § 404.1529). The ALJ must first determine whether objective medical evidence[10] shows that the claimant has a medically determinable impairment that could reasonably be expected to cause the kind and degree of pain alleged. 20 C.F.R. § 404.1529(a); *see also Craig,* 76 F.3d at 594. If the claimant clears this threshold, then the ALJ must evaluate the intensity and persistence of the claimant's pain to determine the extent to which it affects her physical or mental ability to work. SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996); *see also Craig,* 76 F.3d at 595.

   The latter analysis often requires the ALJ to determine "the degree to which the [claimant's] statements can be believed and accepted as true." SSR 96–7p, 1996 WL 374186, at *2, *4. The ALJ cannot reject the claimant's subjective description of her pain "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. § 404.1529(c)(2). A claimant's allegations of pain "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying

---

[10] Objective medical evidence is any "anatomical, physiological, or psychological abnormalities" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of medically acceptable diagnostic techniques." 20 C.F.R. § 404.1528(b)–(c). "Symptoms" are the claimant's description of his or her impairment. *Id.* § 404.1528(a).

impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers." *Craig*, 76 F.3d at 595. The ALJ must consider all the evidence in the record, including the claimant's other statements, her daily activities, her treatment history, any medical-source statements, and the objective medical evidence, including "objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.)." *Id.* (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)). The ALJ must give specific reasons, supported by relevant evidence in the record, for the weight assigned to the claimant's statements. *Eggleston v. Colvin,* No. 4:12cv43, 2013 WL 5348274, at *4 (W.D. Va. Sept. 23, 2013) (citing SSR 96–7p, 1996 WL 374186, at *4).

A reviewing court will defer to the ALJ's credibility determination except in "exceptional circumstances." *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)). "Exceptional circumstances include cases where a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Edelco*, 132 F.3d at 1011. Here, Johnson alleges multiple errors in the ALJ's credibility analysis. She argues that it was error for the ALJ to find that her history of repeatedly applying for disability benefits undermined her credibility. This is a reasonable objection. There is nothing inherently untrustworthy about a claimant seeking benefits, even after being denied for a prior period of alleged disability. The fact that Johnson has filed multiple disability applications is not by itself probative of anything more than Johnson's belief that she continues to be disabled. *See Wilson v. Astrue*, 602 F.3d 1136, 1145 (10th Cir. 2010) ("[I]t is obvious that seeking benefits does not lead to an adverse credibility finding; people who are unable to work need and are entitled to such benefits."); *Haines v. Astrue*, Civil No. SAG-10-cv-822, 2012 WL 94612, at *2 (D. Md. Jan. 10, 2012) (finding that

the ALJ's conclusion that the claimant's multiple applications for disability undermined her credibility to be "inappropriate because it is purely speculative"). This fact therefore does not support the ALJ's credibility finding.

In addition, Johnson argues that the ALJ erred in discrediting her claims regarding the severity of her fibromyalgia pain for lack of supporting objective medical evidence. Johnson is correct to note that a lack of substantiating objective medical evidence says little about the severity of a claimant's fibromyalgia symptoms. Fibromyalgia is, by definition, a diagnosis of exclusion, *see* SSR 12-2P, 2012 WL 3104869, at *2–3 (July 25, 2012), and is typically not accompanied by objective findings. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("[Fibromyalgia]'s symptoms are entirely subjective."); *Tucker v. Astrue*, No. 5:11cv137, 2013 WL 1211583, at *4 (W.D. Va. Mar. 1, 2013) ("[N]ormal physical examination findings, which the Law Judge did not specifically consider in her report, are not unusual or highly relevant to diagnosing fibromyalgia or its severity, as fibromyalgia patients typically manifest normal strength, neurological reactions, and range of motion." (citing *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 819–20 (6th Cir. 1988))), *report and recommendation adopted*, 2013 WL 1196672 (W.D. Va. Mar. 25, 2013).

Thus, when evaluating the severity of a claimant's fibromyalgia-related pain, objective signs are mostly irrelevant and are not an appropriate basis for discrediting the claimant's subjective descriptions of her pain. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (reversing ALJ's credibility determination based on lack of objective evidence); *Green-Younger v. Barnhart*, 335 F.3d 99, 108–09 (2d Cir. 2003) (reversing ALJ decision discrediting the claimant's statements regarding severity of her fibromyalgia based on lack of objective findings); *Sarchet*, 78 F.3d at 307 (noting that the absence of objective symptoms such

as swelling of the joints "is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced").

Johnson has focused this appeal on the ALJ's assessment of her fibromyalgia and the restrictions it caused. Her claim at the administrative level was broader as she claimed to be disabled from fibromyalgia, depression, anxiety, high blood pressure, degenerative joint disease, osteoarthritis, and anti-nuclear antibodies. R. 248. Because the ALJ was required to consider more than just Johnson's fibromyalgia, I can find no fault with the ALJ's discussion of objective signs, imaging, and testing as they are certainly relevant to some of her other impairments. Furthermore, to the extent the ALJ erred by determining that the lack of objective signs and Johnson's conservative treatment undermined her credibility as to her fibromylagia, that error is harmless because other evidence supports the ALJ's credibility determination as to that condition, and the longitudinal record does not support a finding that Johnson's fibromyalgia-related pain was disabling.

Johnson's doctors often described her fibromyalgia pain as mild or moderate and under control. On multiple occasions, she reported that medications, injections, and exercise provided relief from her pain. She utilized these treatments sporadically, however, with little explanation for why she chose to stop, and she even occasionally declined some forms of conservative treatment outright. *See, e.g.*, R. 739, 823, 827, 997.

Under the pain standard, 20 C.F.R. § 404.1529, an ALJ may properly consider a claimant's course of treatment in assessing whether the claimant's statements about her pain are credible. 20 C.F.R. § 404.1529(c)(3). Johnson's pain was treated primarily by NSAIDS, such as Aleve and Ibuprofen; counseling for pain management; physical therapy; and injections. As Johnson's treating physicians noted, this course of treatment is considered conservative. *See*

*Hauser v. Commissioner of Social Security*, No. 1:12-cv-796, 2014 WL 48554, at *9 (S.D. Ohio

Jan. 7, 2014) ("[I]t is proper to classify taking prescription medication and receiving injections as

'conservative' treatment."); *Shaw v. Colvin*, No. 4:12CV451, 2013 WL 3546665, at *9, 18 (E.D.

Mo. July 11, 2013) (characterizing prescription of Percocet as "conservative treatment").

Because "[m]any potentially disabling conditions can be treated by routine and conservative

treatment," the characterization of treatment as conservative "alone does not provide any insight

into the severity of a given condition and may even belie the condition's seriousness."[11] *Viverette*

*v. Astrue*, No. 5:07-cv-395-FL, 2008 WL 5087419, at *2 (E.D.N.C. Nov. 24, 2008). A claimant

cannot be faulted "for failing to pursue non-conservative treatment options where none exist."

*Lapierre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010). In particular, the treatment

options available for fibromyalgia are all conservative in nature. Mayo Clinic, *Fibromyalgia*

*Treatments and drugs*, http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/

treatment/con-20019243 (last visited March 10, 2016) ("In general, treatments for fibromyalgia

include both medication and self-care."); American College of Rheumatology, *Fibromyalgia*,

http://www.rheumatology.org/Practice/Clinical/Patients/Diseases_And_Conditions/Fibromyalgia

(last visited April 30, 2014) (identifying medications and non-drug treatments as potentially

appropriate for fibromyalgia). Surgery is not recommended for fibromyalgia, *Brosnahan v.*

*Barnhart*, 336 F.3d 671, 677 (8th Cir. 2003), and can actually make the condition worse, 6

*Attorneys Medical Advisor* § 44.59 (2014) (citing Aaron *et al.*, *Perceived Physical and*

*Emotional Trauma as Precipitating Events in Fibromyalgia*, 40 Arthritis & Rheumatism 453

(No. 3 (Mar.) 1997)).

---

[11] Courts have recognized that Fibromyalgia typically is not a disabling condition. *Sarchet*, 78
F.3d at 307.

Recognizing this evidence, many courts have appropriately viewed with skepticism ALJ decisions citing conservative treatment to discredit a claimant or her treating physicians. *See, e.g.*, *Johnson v. Astrue*, 597 F.3d 409, 412 (1st Cir. 2009) ("The ALJ next found that Dr. Ali's RFC opinion was inconsistent with his prescription of physical therapy and aerobic exercise. The first problem with this reasoning is that this is the appropriate treatment for fibromyalgia."); *Grimsley v. Astrue*, No. 1:07cv763, 2009 WL 737109, at *7 (M.D.N.C. Mar. 23, 2009). But that does not mean an ALJ may not consider the nature of treatment at all in fibromyalgia cases. Even for fibromyalgia patients, it is possible to differentiate between a relatively aggressive course of treatment, *see, e.g.*, *Grimsley*, 2009 WL 737109, at *7 ("The medical records reflect … that [the plaintiff's rheumatologist] repeatedly changed [her] medications and dosages in an effort to better alleviate her pain and fatigue."), and a relatively conservative one, *see, e.g.*, *Cordell v. Astrue*, No. 4:09-cv-19, 2010 WL 446944, at *15 (E.D. Tenn. Feb. 2, 2010) ("Here, in a single treatment note from December 2005, Dr. Mangru diagnosed Plaintiff with fibromyalgia and prescribed a rather conservative course of care consisting of psychotropic medications [Effexor and Lyrica] and continued physical therapy…."). Furthermore, "when considered with other information, the routine nature of a course of treatment may indicate that a condition is not as severe as a plaintiff's subjective complaints may otherwise indicate." *Viverette*, 2008 WL 5087419, at *2.

Johnson's treating physicians primarily prescribed NSAIDs and physical therapy to address her pain. When Johnson followed this treatment, she often reported that the medications, such as Aleve, relieved her pain. The ALJ could properly question the severity of Johnson's pain based on his assessment that her treatment for fibromyalgia was routine and conservative.

Furthermore, the ALJ was justified in finding that Johnson's inconsistent statements undermined her credibility. Courts have long allowed parties to use a witness's prior inconsistent statements to impeach his or her testimony. *See Vest v. Colvin*, No. 5:13cv67, slip op. at 52 (W.D. Va. July 17, 2014) (collecting cases), *adopted by* 2014 WL 4656207, at *2–3 (W.D. Va. Sept. 16, 2014); *cf. United States v. Hale*, 422 U.S. 171, 176 (1975) ("A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness."). Johnson's testimony that she spends most of the day in bed and that her pain persisted every day and throughout the day, *see* R. 44, 46, 267, is inconsistent with her later descriptions of her activities, such as going on walks, shopping, attending medical appointments, going to church, and babysitting for her grandchildren. Her statement that she last worked as a nanny around 2007, R. 56–58, is flatly contradicted by the medical record, which shows that she worked at least part-time up until her fall in August 2012, R. 1029. These inconsistencies provide substantial evidence to support the ALJ's determination that Johnson's testimony as to the severity of her symptoms was not credible. Because the ALJ's credibility finding is supported by substantial evidence and because any errors in the ALJ's analysis are harmless, I will not disturb this determination.

B.     *Opinion Evidence*

1.     *The ALJ's Determination*

In making his RFC determination, the ALJ rejected Dr. Casey's opinion that Johnson could not maintain regular employment secondary to the unpredictable nature of her pain. He first found that this was an opinion on an ultimate issue of disability that is reserved to the Commissioner. He also considered the longitudinal record and found that Dr. Casey's opinion was inconsistent with Johnson's treatment records. He found that Johnson's treatment notes

reported mild physical findings and generally routine and conservative treatment and that none of Johnson's specialists had suggested that she could not work at all. R. 31–32.

He further observed that Dr. Casey herself did not object when Johnson stated that she was going to return to light duty work. The ALJ found that Dr. Casey's statement that Johnson had been unable to maintain regular employment for the previous twelve years was contrary to fact. He opined that Dr. Casey's assessment "is more based on [Johnson's] reported symptoms and limitations, rather than on objective findings and diagnostic test results." Finally, he noted that Dr. Casey was incorrect in stating that Johnson had been compliant with all treatment recommendations. R. 32.

Instead, the ALJ generally adopted the assessments of the DDS and SSA doctors because they were consistent with the evidence of record. He also opined that evidence that had been received after the DDS determinations did not undermine their findings. R. 32.

    2.    *Analysis*

Johnson objects to the ALJ's rejection of Dr. Casey's opinion and instead argues that because it was a treating physician's opinion, it should have been given controlling weight. ALJs must weigh each medical opinion in the applicant's record. 20 C.F.R. § 404.1527(b). The regulations classify medical opinions by their source: those from treating sources and those from non-treating sources, such as examining physicians and state-agency medical consultants. *See id.* § 404.1527(c). A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); 20 C.F.R. § 404.1527(c)(2). An ALJ may reject a treating physician's

opinion in whole or in part if there is "persuasive contrary evidence" in the record. *Hines*, 453 F.3d at 563 n.2; *Mastro*, 270 F.3d at 178.

The ALJ must "give good reasons" for discounting a treating physician's medical opinion. 20 C.F.R. § 404.1527(c). He also must consider certain factors in determining what weight to give that opinion, such as the length and nature of the doctor–patient relationship, the weight of the evidence supporting the opinion, the physician's medical specialty, and the opinion's consistency with other evidence in the record. *See id.*; *Clausen v. Astrue*, No. 5:13cv23, 2014 WL 901208, at *9 (W.D. Va. Mar. 7, 2014). That obligation is satisfied when the ALJ's decision indicates that he considered the required factors. *Burch v. Apfel*, 9 F. App'x 255, 259 (4th Cir. 2001) (per curiam); *see also Vaughn v. Astrue*, No. 4:11cv29, 2012 WL 1267996, at *5 (W.D. Va. Apr. 13, 2012), *adopted by* 2012 WL 1569564 (May 3, 2012). The ALJ must consider the same factors when weighing medical opinions from non-treating sources. 20 C.F.R. § 404.1527(c), (e)(2).

Here, the ALJ provided detailed reasoning to explain his decision to reject Dr. Casey's assessment. He correctly noted that Dr. Casey's opinion regarding Johnson's inability to maintain regular employment is a finding that is reserved to the Commissioner because it goes to the ultimate question of whether Johnson has been disabled. *See* 20 C.F.R. § 404.1527(d)(1); SSR 96-5P, 1996 WL 374183, at *5 (July 2, 1996). This part of Dr. Casey's opinion is not entitled to any special weight, but at the same time it cannot be completely disregarded. SSR 96-5P, 1996 WL 374183, at *5. Instead, it is necessary to consider whether Dr. Casey's assessment is otherwise consistent with the record.

Johnson correctly notes that the lack of significant objective findings is not an adequate reason to discredit statements regarding the effects of her fibromyalgia. Nonetheless, there is still

ample "persuasive contrary evidence" in the record that could allow the ALJ to discredit Dr.

Casey's opinion. As the ALJ observed, some of Dr. Casey's conclusions are plainly contradicted

by other evidence. Although Dr. Casey opined that Johnson had not been able to work for the

previous thirteen years, Johnson herself testified that she worked at least part-time through 2007.

R. 56–61; *see also* R. 283–90 (stating, in her work history report, that she worked about 40 hours

per week in various jobs from 1992 through 2007); R. 1029 (stating that Johnson had to stop

working as a nanny after her slip and fall in August 2012). In addition, Dr. Casey's statement

that Johnson had fully complied with all treatment suggestions is incorrect. As discussed *supra*,

there are numerous instances in the record in which Johnson declined therapy or injections,

failed to fill prescriptions, or simply stopped taking her medication. Johnson's unwillingness to

adhere to her physicians' treatment recommendations to control her pain is a reason to question

the severity of her pain. Moreover, treatment records consistently show that medications and

other conservative treatments–when Johnson followed them–were effective in controlling her

pain. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling."

*Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (per curiam). The fact that Johnson may

have experienced some pain does not establish that she is disabled. *Hays v. Sullivan*, 907 F.2d

1453, 1457–58 (4th Cir. 1990) ("An individual does not have to be pain-free in order to be found

'not disabled.'").

It is the job of the ALJ, not this Court, to determine the extent to which this contradictory

evidence undermines the basis for Dr. Casey's opinion. *Richardson*, 402 U.S. at 399. The ALJ

found that these issues were significant enough that he gave no weight to Dr. Casey's opinion,

and there is substantial evidence to support this determination.[12] Likewise, there is sufficient evidence to support the ALJ's decision to adopt the DDS and SSA assessments. An ALJ may rely on a non-examining physician's opinion when that opinion is consistent with the record. *Gordon*, 725 F.2d at 235. Johnson has not identified any inconsistency between the DDS and SSA assessments and the record, but instead asserts once more that their opinions are flawed because they rely on the absence of objective evidence to conclude that Johnson's fibromyalgia symptoms are not as severe as she claims. Again, however, this argument fails because the only parts of the record that suggest that Johnson's fibromyalgia symptoms are disabling—Johnson's own statements and Dr. Casey's opinion—were properly discounted. Therefore, the ALJ's weighing of the opinion evidence is supported by substantial evidence.

## V. Conclusion

The Court must affirm the Commissioner's final decision that Johnson is not disabled if that decision is consistent with the law and supported by substantial evidence in the record. The Commissioner has met both requirements. Accordingly, the Court will **DENY** Johnson's motion for summary judgment, ECF No. 13, **GRANT** the Commissioner's motion for summary judgment, ECF No. 18, and **DISMISS** this case from the docket.

The Clerk shall send certified copies of this Memorandum Opinion to all counsel of record.

ENTER: March 18, 2016

Joel C. Hoppe
United States Magistrate Judge

---

[12] Dr. Casey's second letter, which she submitted subsequent to the ALJ's decision, is largely consistent with her first letter and, thus, does not command a different result.